503 F.Supp. 19 (1980)
Leonard H. BURST et al., Plaintiffs,
v.
ADOLPH COORS COMPANY, a Colorado Corporation, Defendant.
No. 79-1372C(B).
United States District Court, E. D. Missouri, E. D.
June 17, 1980.
*20 Thomas B. Curtis, Clayton, Mo., for plaintiffs.
Alan C. Kohn, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
REGAN, District Judge.
This matter is before the Court on motion of defendant to dismiss or in the alternative for summary judgment. We rule the motion on the basis of the admitted facts alleged in the complaint, the exhibits, the uncontroverted affidavit submitted by defendant and plaintiffs' suggestions in opposition to the motion.
Defendant, a Colorado corporation, with its only brewery in Golden, Colorado, is the fifth largest brewer of beer in this country. On August 19, 1977, in response to a news release by defendant, plaintiffs, acting through Leonard H. Burst, submitted a letter to the president of defendant "expressing an interest in a distributorship," following which plaintiffs' group was "placed on file as a prospective applicant for a Coors distributorship." About September 16, 1977 plaintiffs received the requested application forms with detailed instructions for the preparation of the application and Coors' "Basic Distributor Selection Guidelines."
At the time defendant had finalized its decision in the late summer of 1977 to expand its beer distribution into Missouri, it had on file approximately 1,600 prospective applicants for this state and each of them was mailed formal application forms. In the early fall of 1977, 379 of these application forms were completed and returned to defendant. The state of Missouri had been divided by defendant into 13 separate geographical areas and applicants were requested to make application only for one specific area other than Area No. 11, South St. Louis, which would be operated by Coors Distributing Company. A total of 35 applicants (including plaintiffs) were submitted for Area No. 10, North St. Louis.[1] Four of these applicants received field interviews at a St. Louis hotel, one of these interviews being of plaintiffs Leonard Burst and Douetta Burst Davis on December 5, 1977. Subsequently, a further meeting was scheduled in the sales department of defendant in Golden, Colorado on January 19, 1978, in connection with which plaintiffs were requested to (and did) present additional information (financial statements and letters of reference). Only those applicants who received the highest ratings at the initial field interviews were invited to Golden, Colorado for further interviews. Plaintiffs were the only applicant for Area No. 10 North St. Louis who were granted the second interview. Thereafter, about February 7, 1978, plaintiffs' application was rejected. About 2 months later, plaintiffs' application data was returned to them. None of the original applicants for Area No. 10 was awarded that distributorship. Instead, defendant determined that until a "suitable" applicant could be found, its wholly owned subsidiary, Coors Distributing Company, would handle the distribution of Coors' products in Area No. 10 in addition to Area No. 11. In early 1979, defendant awarded the distributorship for the City of St. Louis to United City Distributors. Coors Distributing Company serves the remaining portions of Areas Nos. 10 and 11.
Plaintiffs' claim, as to Count I, is based on defendant's alleged failure to comply with its "Basic Distributor Selection Guidelines," *21 as the result of which plaintiffs were allegedly caused to expend money, time and effort in making a "first class application presentation" to Coors. They rely on the following portions of the Guidelines:
"2. Applicants may apply originally for only one area. The Brewery Interview Committee, however, will appoint for each area only an applicant(s) they feel, in their judgment, is fully qualified. Should the committee determine that there are no qualified applicants for one area and/or a better qualified applicant(s) is available from another area, they will appoint the one best qualified. Applicants should be aware that they are competing with all applicants on file for a given state, and these do not necessarily have to be residing in the area. In situations where qualifications are equal, preference will be given to the applicant(s) that applied for the area and resides in the area involved."
"5. The following are not eligible under any conditions:
a. Employees of the Adolph Coors Company.
b. Coors Distributors, including stockholders and officers, unless such stockholders or officers coincidently sever their relationship with present distributor in a Coors Distributorship.
c. No Coors Distributor will have any financial interest in any Coors Distributorship other than his own, excepting any agreements, arrangements, or financial contracts made prior to September 1, 1966."
The Guidelines caution applicants that only one appointment can be made for each area and that although time, effort and travel will be required to complete a presentation, "the only assurance that [Coors] can give each applicant is fair and equal consideration." The following procedure in arriving at a selection decision is set forth in the Guidelines:
"Written presentations are evaluated twice and then reviewed by the Expansion Manager. From these two evaluations and review, qualified applicants are scheduled for a field interview. Each field interview team consists of two Company representatives. The interview team reviews the applicant's written presentation, conducts a ninety minute field interview, records the interview, and prepares a written evaluation of the information presented by each applicant(s). At the conclusion of each day's interviews, the combined interview teams meet and discuss in detail each interview and the evaluation. Applicants are selected for brewery interviews from these in-depth reviews. Brewery interviews are conducted and the selection decision is made by the Brewery Interview Committee only after extensive consideration and this decision is final."

In their Suggestions in opposition to defendant's motion, plaintiffs argue that Count I is not grounded upon fraud, but is based on the theory of promissory estoppel. Accordingly, we rule the motion on that premise. The parties are in agreement that Missouri follows the doctrine of promissory estoppel as stated in § 90 of the Restatement of Contracts, and as applied in Debron Corporation v. National Homes Construction Corporation, 8 Cir. 1974, 493 F.2d 352:
"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."
It is self-evident that the doctrine has no application absent, initially, (in the language of Debron, supra) "A binding offer in the form of a promise." What, then, was the promise in the Guidelines which defendant should reasonably have expected to induce action "of a definite and substantial character on the part of plaintiffs"? Of importance is the fact that plaintiffs' application was but one of 35 seeking the Area No. 10 distributorship. It must not be overlooked that when plaintiffs submitted their application they could not have known how many other applicants might be seeking the Area No. 10 distributorship, nor for that *22 matter how well qualified such other applicants might be.
In effect, plaintiffs' position is that they were "the best qualified" applicant for Area No. 10 and that if they had known they would not receive the appointment they would not have expended time, effort and money in the amount and value of $175,000 in making their presentation. A similar contention could conceivably be made by each of the other applicants. Yet, absent objective, definite standards, there is no means by which a court or jury could judge their qualifications. Plaintiffs' contention is based on the assumption that defendant had unambiguously promised to appoint the "best qualified" of the applicants for Area No. 10 whether or not in defendant's judgment such applicant met defendant's subjective standards. We do not so construe the Guidelines.
As we view the Guidelines, they are at most an invitation to all interested persons to submit applications for defendant's consideration. The only express promise (or "assurance") in the Guidelines was that each applicant for a particular distributorship would receive "fair and equal consideration" for such distributorship.
The instant case is wholly unlike Debron or any of the Missouri or other cases cited by plaintiffs. Whatever the representations made by defendant, this is not a one-on-one situation. Rather, the representations were to all who chose to apply for the distributorship and to expend time, effort and money in doing so. In Debron, a subcontractor submitted a bid on the basis of which, to the subcontractor's knowledge, the general contractor submitted its total bid for a construction project. As the Court said, "(t)he facts show a sufficient promise by (the subcontractor) that it would perform a specific job at a certain price", and thus in view of the knowledge of the subcontractor that its bid would be used on the overall construction project, the promise was justifiably relied on.
In Feinberg v. Pfeiffer, 322 S.W.2d 163 (Mo.App.1959), the defendant promised to pay plaintiff the sum of $200 a month upon her retirement. Relying on that promise, she subsequently retired. The Court held that to prevent injustice to plaintiff who had been induced to act to her detriment, defendant was estopped to resist payment on the ground that its promise was given without consideration. And in the case of In re Jamison Estate, 202 S.W.2d 879 (Mo. 1947), the defendant who was unfamiliar with the brokerage business permitted her brother to carry a brokerage account in her name upon his representation that he would assume any loss. The Court held that the estate of the brother which had paid the amount of the loss pursuant to the brother's guaranty was estopped to invoke the doctrine of subrogation against the sister.
Other Missouri cases cited in Debron (e. g. School District of Kansas City v. Stocking, 138 Mo. 672, 40 S.W. 656 (1979), and Underwood Typewriter Co. v. Century Realty Co., 220 Mo. 522, 19 S.W. 400 (1909) are equally inapposite.
Here, plaintiffs' expenditure of time, effort and money in making their application and subsequent presentation did not result from a promise that if they did so, they would be appointed distributor for Area No. 10 on terms and conditions which would later be spelled out. While it may well be that by reason of the trip to Colorado by two of plaintiffs for the second interview, plaintiffs expended more time and money than did others of the applicants, they had no assurance that such additional expenditures would entitle them to the distributorship.
As distinguished from fraud, the doctrine of promissory estoppel is not concerned with the good faith or bad faith of the promissor in making the promise allegedly relied on. That is irrelevant to the issue of whether an enforceable promise was in fact made. At the time the Guidelines were disseminated, defendant did not and could not know how many of the 1600 prospective applicants would actually submit applications, nor how many, if any, of these would be interested. It does not comport with reason that defendant would commit itself in all events to appoint one of the *23 applicants as its distributor, considering what was at stake for defendant. It is, of course, true, that only four of the 35 applicants for Area No. 10 received an initial interview, a fact which would imply that defendant considered that only these 4 might ultimately be deemed sufficiently qualified. It is also true that of the 4 finalists only plaintiffs were accorded a second interview, a fact which meant only that defendant deemed them worthy of further consideration.
In our judgment, defendant was not legally bound in all events by any promise in its Guidelines to appoint one of the applicants as distributor for Area No. 10. Defendant had the right to postpone the ultimate award of the distributorship to such time as it was able to secure a distributor who fully satisfied defendant's subjective standards, even if such postponement necessitated the temporary appointments of its subsidiary and ultimately the revision of the boundaries of Area No. 10.
In the classic promissory estoppel situation, the issue is whether the promise, initially without consideration, but which has induced action or forbearance, is nevertheless binding on the promissor. That issue, in turn, is dependent on whether injustice can be avoided only by enforcement of the promise. And in each of the Missouri cases applying the doctrine, the Court avoided injustice by enforcing the specific promise. Yet, plaintiffs are not seeking enforcement of any promise to appoint them as distributor for Area No. 10 or even damages proximately resulting from the breach of such a promise. So, too, if the promise on which plaintiffs allegedly relied is that defendant would not appoint its subsidiary as a distributor, there is no showing whatever to support a finding that injustice to plaintiffs can be avoided only if some one other than Coors Distributing Company, but not necessarily plaintiffs, receives the appointment. Here, too, the damages sought could not have proximately resulted from a breach of such assumed promise. Query: On plaintiffs' present theory, would they have a right to recover the $175,000 if defendant had appointed one of the other 34 applicants for Area No. 10 or one of the 334 applicants for other areas in this state who might conceivably have been granted the distributorship if defendant believed such other applicant best met defendant's standards?
Counts II and III proceed on the theory of unjust enrichment. Count II (after incorporating by reference all of Count I) alleges that as the result of the researched data in plaintiffs' application for the distributorship, defendant "became aware for the first time of the advantageous market and profitability potential of Area No. 10 and as such Defendant Coors determined to keep and operate Area No. 10 for its own corporate benefit", thereby unjustly enriching defendant in an amount in excess of $1,500,000 as the direct result of its breach of promise and contract.
Count III, also incorporated by reference Count I, and further alleged that defendant used to its own advantage plaintiffs' "valuable work product", namely the "market, demographic, and financial projections relating to the operation of a distributorship in Area No. 10" as contained in its application. Plaintiffs argue that inasmuch as they were not appointed distributor, defendant is obligated to compensate them for the information contained in their application. However, in an affidavit in support of the motion for summary judgment, it is stated that the information in plaintiffs' application was of no use or value to defendant, that the only use made of any material therein was as a basis to consider the application," and that the information in the various applications related almost exclusively to the individual qualifications of the particular applicants. There has been no counter affidavit and plaintiffs have not pointed out any information they supplied which was or could be used by defendant to plaintiffs' detriment. And obviously, similar or comparable projections (or guesses) of future sales in the St. Louis market had also been made by each of the other 34 applicants who sought the distributorship, to say nothing of the fact that *24 defendant would not have invited applications for the distributorship in the first instance had it not theretofore determined that the market had a desirable potential.
It follows from the foregoing that defendant's alternative motion for summary judgment should be and it is hereby SUSTAINED. Judgment will be entered accordingly.
NOTES
[1] Together, Areas 10 and 11 comprised the entire City of St. Louis and adjoining counties.